## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ILLINOIS

BETH MCGRATH,

*Plaintiff*,

v.

THE CITY OF GRANITE CITY, ILLINOIS,

*Defendant.*

Case No. <u>3:20-cv-1169</u>

---

## COMPLAINT

---

## INTRODUCTION

1.      For well over a decade, the City of Granite City, Illinois, maintained and enforced a compulsory-eviction program as senseless as it was cruel. Routinely, the City would order private landlords to evict entire families because a tenant or guest committed a crime within city limits. Between 2010 and late 2019, high-ranking Granite City police officers issued these compulsory-eviction demands to more than 550 households. On information and belief, hundreds of people lost their homes as a result.

2.      Beth McGrath can count herself among them. In the fall of 2018, Beth lived in a rented home in Granite City, with a nephew and her 22-year-old son. Her son, Quinton, has schizophrenia and autism. Barely two months after moving into her new home, Beth received a compulsory-eviction demand from Granite City's "Crime Free Housing Unit." Beth had committed no crime. She had done nothing wrong. But an ex-boyfriend, who sometimes stayed with her, had been arrested for stealing steel appliances elsewhere in town. And for Granite City, that was enough to coerce Beth out of her home. The police department ordered her landlord to

evict her. A hearing officer likewise ordered that the landlord "must begin eviction proceedings." And when Beth pleaded to be allowed to stay, the City's Crime-Free Housing Officer responded with words to the following effect: "If you feel bad, you should keep better company."

3.      As a direct and proximate result of Granite City's enforcement of its crime-free housing law, Beth lost her home. The consequences were devastating. The first night after leaving, she and Quinton slept in their car. For weeks after, they stayed in motel rooms and on friends' couches. Each day was a struggle to figure out where they would eat and sleep and clean themselves. Beth ended up having to give away many of their belongings, or sell them at a steep discount, because she was desperate for money. In punishing Beth for a crime she did not commit, Granite City stripped her of her home, her belongings, her security, and her dignity. She seeks a judgment from this Court to hold the City accountable for violating her rights.

## JURISDICTION AND VENUE

4.      Plaintiff Beth McGrath brings this civil-rights lawsuit under the U.S. Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

5.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, 2201, and 2202 and 42 U.S.C. § 1983.

6.      Venue lies in this Court under 28 U.S.C. § 1391.

## PARTIES

7.      Plaintiff Beth McGrath is a citizen of the United States and a resident of the City of Alton, Illinois.

8.      Defendant City of Granite City, Illinois ("Granite City" or "City") is a municipal entity organized under the constitution and laws of the State of Illinois. Defendant is located at 2000 Edison Avenue, Granite City, Illinois.

## FACTUAL ALLEGATIONS

9.      From around 2006 till earlier this year, Granite City enforced a "crime-free housing ordinance." Under the ordinance, the City routinely used the threat of sanctions to coerce private landlords to evict private tenants who did nothing wrong. Between 2010 and 2019, the City issued compulsory-eviction demands to more than 550 households—among them, Beth McGrath's.

**A.      "He is guilty if I say he is guilty": Granite City's compulsory-eviction law**

10.     In 2013, the *St. Louis Business Journal* asked Brian Konzen to identify the "[m]ost controversial issue you've worked on" during his many years as city attorney for Granite City. His answer: the "crime-free housing program." Julie Murphy, *Beyond zoning: St. Louis area attorneys see it all*, St. Louis Bus. J. (Sept. 27, 2013).

11.     Benign in label, Granite City's "crime-free housing program" was deeply unconstitutional in practice. In truth, it was a compulsory-eviction program. Under it, the City could—and did—coerce private landlords to evict entire families from their homes based on crimes committed by other people at other places.

12.     First enacted in 2006, Granite City's compulsory-eviction law applied to all rental properties located within the corporate limits of Granite City. The law also applied to certain properties that were subject to a "contract for deed" (also known as an installment contract). Granite City Mun. Code § 5.142.010. (Citations in this Complaint to the Granite City Municipal Code are to the version of the code in force during the time relevant to this case.)

13.     Granite City's compulsory-eviction law was not limited in its application to public housing.

14.     Rather, Granite City's compulsory-eviction law applied to all private rental properties in the City.

15.     Landlords were subject to governmental sanctions if they violated the compulsory-eviction law. These governmental sanctions included monetary fines and suspension or revocation of their business license.

16.     Among the violations that could give rise to governmental sanctions were the following:

> The failure of the licensed lessor to take prompt, diligent and lawful steps to remove the lessees from possession of the rental unit;
>
> a.     Following notice of the commission of a felony in the rental unit where allowed or permitted by lessee, or
>
> b.     Following notice of four ordinance violations in the residential rental unit, where allowed or permitted by lessee, or
>
> c.     Following notice of other violation of the crime-free housing lease addendum, exhibit B, as now or as hereafter amended, where violation of that lease addendum expressly constitutes good cause for termination of the lease.

*Id.* § 5.142.050(A)(3).

17.     The addendum referenced in Section 5.142.050(A)(3)(c) proscribed all manner of criminal offenses committed by tenants, members of their households, or guests—not just on the rental property, but elsewhere too. For example, the addendum provided:

> a.     The "Lessee or any member of lessee's household, shall not engage in criminal activity, including drug-related criminal activity, within the city limits of the City of Granite City." Lease Addendum for Crime Free Housing ¶ 1.

-4-

b.    The "Lessee or members of lessee's household, <u>shall not engage in any act intended to facilitate criminal activity,</u> including drug-related criminal activity within the city limits of the City of Granite City." *Id.* ¶ 3 (emphasis in original).

c.    The "Lessee, or a member of lessee's household, shall not engage in any criminal activity found to be equivalent to a Forcible Felony at any location, on the property premise or otherwise." *Id.* ¶ 8.

18.    At all relevant times, moreover, it was Granite City's policy and practice to expand certain of these addendum provisions even further. For example, the addendum provided that neither the lessee nor "members of lessee's household" shall engage in any act intended to facilitate criminal activity within city limits. *Id.* ¶ 3. But in compulsory-eviction demands, the City asserted that it was enough for a "Lessee's guest" to have engaged in such an act.

19.    The addendum further provided that "a single violation of any of the provisions" in the addendum "shall be good cause for termination of lease." *Id.* ¶ 9.

20.    The addendum was not a "lease addendum" as most people would understand that phrase. Neither landlords nor tenants were free to negotiate or opt out of the addendum. Rather, the City mandated that landlords and tenants sign the document as a condition of receiving their occupancy permits. Even that was an empty act; if no one were to sign it, the addendum still would apply. By law—the ordinance provided—"[e]very agreement for lease of residential real estate located within the corporate limits of the city of Granite City . . . shall be deemed to include all terms listed on the lease addendum." Granite City Mun. Code § 5.142.060.

21.    In this way, Granite City's compulsory-eviction law differed fundamentally from the type of program recommended by the original developer of crime-free housing programs. In

2019, the founder and executive director of the International Crime Free Association Inc. "said his association recommends cities implement voluntary programs, not mandatory ones." Garrett Bergthold, *ACLU challenges Adelanto's crime-free rental law*, Daily Press (Mar. 19, 2019), https://tinyurl.com/y5w4cflx. More recently, he told a journalist "that he and his association advise against mandatory crime-free-housing programs that require landlords to follow police recommendations." Leora Smith, *When the Police Call Your Landlord: Crime-free-housing programs are quietly giving police widespread influence over landlords and their tenants*, The Atlantic (Mar. 13, 2020), https://tinyurl.com/tfxkdkt.

22.     At all times relevant to this case, Granite City embraced just such a "mandatory crime-free-housing program[]." Not only were landlords and tenants automatically deemed to have acquiesced to the City's crime-free lease addendum, but landlords were required by law to enforce the addendum whenever the City demanded that they do so. As described above, a landlord was required by law "to take prompt, diligent and lawful steps to remove the lessees from possession of the rental unit" upon the City's notifying the landlord of any "violation of the crime-free housing lease addendum." Granite City Mun. Code § 5.142.050(A)(3)(c).

23.     The end result of Granite City's compulsory-eviction law was that landlords were required by law to evict entire families whenever the City claimed that any guest of a tenant or member of a tenant's "household" (1) "engage[d] in criminal activity" anywhere in Granite City, (2) "engage[d] in any act intended to facilitate criminal activity" anywhere in Granite City, or (3) committed a "forcible felony" anywhere at all. *See* Lease Addendum for Crime Free Housing ¶¶ 1, 3, 8; *see also* Granite City Mun. Code § 5.142.050(A)(3)(c).

24.     If the City demanded that a landlord evict a lessee under the compulsory-eviction law, the landlord did not have discretion to forgo eviction because the lessee was innocent of any wrongdoing.

25.     If the City demanded that a landlord evict a lessee under the compulsory-eviction law, the landlord did not have discretion to forgo eviction because the lessee was not involved in the alleged criminal activity.

26.     If the City demanded that a landlord evict a lessee under the compulsory-eviction law, the landlord did not have discretion to forgo eviction because the lessee was unaware of the alleged criminal activity.

27.     If the City demanded that a landlord evict a lessee under the compulsory-eviction law, the landlord did not have discretion to forgo eviction because the alleged criminal activity took place at a location other than the rental property.

28.     If the City demanded that a landlord evict a lessee under the compulsory-eviction law, the landlord did not have discretion to forgo eviction because the alleged criminal activity had no connection to the rental property.

29.     If the City demanded that a landlord evict a lessee under the compulsory-eviction law, the landlord did not have discretion to forgo eviction for any reason at all.

30.     When the City claimed that a predicate crime had taken place under the compulsory-eviction law, the landlord had no choice but to evict the entire family living at the rental property or face revocation or suspension of his license. At the same time, however, nothing in the compulsory-eviction law prevented the same landlord from renting any other property in Granite City to the same evicted tenants. Nor did the compulsory-eviction law prevent any other landlord from renting any other property in Granite City to those tenants.

31.     Before Granite City could take action to revoke or suspend a landlord's business license under the compulsory-eviction law, the ordinance provided that certain procedures "shall be followed." Granite City Mun. Code § 5.142.080. "Simultaneously with the service of any request made upon a landlord for implementation of eviction or other proceedings to terminate a residential lease," Granite City was required to serve upon both "the landlord and the tenant" a notice containing the following information:

       a.     A copy of the compulsory-eviction law;

       b.     The address of Granite City's building and zoning administrator; and

       c.     "[F]acts alleging the grounds for revocation or suspension of the lessor's or landlord'[s] license."

*Id.* § 5.142.080(A).

32.     Upon receipt of this information, either the landlord or the lessee could file a written grievance with the building and zoning administrator "within fifteen days of the date stated on the notice served." *Id.*

33.     If either the landlord or the lessee invoked the grievance process, the City was required to schedule a hearing. *Id.* § 5.142.080(B).

34.     At the hearing, the ordinance provided, "[t]he hearing officer's decision shall be limited to the question whether the landlord must begin eviction proceedings against the tenant." *Id.* § 5.142.080(M).

35.     At the hearing, the ordinance provided, the landlord or the lessee "must first make a showing of an entitlement to the relief sought." *Id.* § 5.142.080(J). Only "thereafter" was the City obliged to "sustain the burden of justifying the action or failure to act against which the grievant is directed." *Id.*

36.    At one such hearing, on information and belief, a high-ranking officer with the Granite City Police Department demanded that a pregnant woman be evicted based on an offense allegedly committed by her fiancé. The police officer, on information and belief, justified the City's position on the following ground: "He is guilty if I say he is guilty." *See Complaint against Granite City*, The Defendant (last visited Oct. 30, 2020), https://tinyurl.com/yyj8un2l.

37.    At all relevant times, there was no requirement in Granite City's compulsory-eviction law that the City prove that the lessees were complicit in a household member's or guest's criminal activity.

38.    At all relevant times, there was no requirement in Granite City's compulsory-eviction law that the City prove that the lessees were aware of a household member's or guest's criminal activity.

39.    For many offenses, there was no requirement in Granite City's compulsory-eviction law that the City prove that the predicate criminal activity occurred at the lessees' home.

40.    At all relevant times, it was not a defense to enforcement of Granite City's compulsory-eviction law that no lessee was complicit in the criminal activity of a household member or guest.

41.    At all relevant times, it was also not a defense to enforcement of Granite City's compulsory-eviction law that the lessees were unaware of the criminal activity of a household member or guest.

42.    For many offenses, it was not a defense to enforcement of Granite City's compulsory-eviction law that the predicate criminal activity occurred at a location other than the lessees' home.

**B.     Beth McGrath**

43.     Beth McGrath has been unemployed and on disability for over a decade. She has two adult sons, the younger of whom, Quinton, is now in his mid-twenties. Quinton suffers from schizophrenia and autism. At all times relevant to this case, Quinton lived with Beth.

44.     Around January 2018, Beth and Quinton moved to Granite City and began living in a rental property on Cleveland Boulevard. During this period, one of Beth's nephews (around seventeen years old) lived with them too; at the time, Beth served as his foster parent.

45.     Beth had difficulty climbing the stairs at her Cleveland Boulevard home. Some of her neighbors also complained about Quinton. Because of his condition, Quinton would often sit outside their house and talk to himself. As Beth understands it, this habit bothered some of their neighbors. Between the stairs and the neighbors, Beth ended up moving out in or around August 2018.

46.     In early September 2018, Beth, Quinton, and Beth's nephew moved into a new rental home, at 1712 Delmar Avenue in Granite City. The home at 1712 Delmar Avenue was owned and rented out by a private landlord.

47.     A month later, around October 14, 2018, Beth rented a U-Haul truck to move some new furniture into the home.

48.     Two men helped Beth move the items: John Garrison and Timothy Woodrome. Beth had previously been in a long-term relationship with John Garrison. They had ended their relationship about a year earlier, but they continued to see each other from time to time and Garrison would sometimes stay over at Beth's home. During Beth's first month at 1712 Delmar Avenue, John Garrison sometimes visited her. And because Beth was unable to transport her new furniture alone, she needed his and Timothy Woodrome's assistance for the move.

49.     John Garrison and Timothy Woodrome helped Beth load the furniture into the truck, unload it at her new house, and move it inside. The next day, the men asked Beth if they could use the U-Haul to move some of Timothy Woodrome's belongings. Beth acquiesced.

50.     That night, the men returned. They told Beth they had not finished moving Timothy Woodrome's belongings and asked whether they could keep the U-Haul for another day. Beth told them that they could keep it if they would pay the truck-rental company for the extra day. Only after the truck-rental company contacted her later that week did Beth learn that the men had kept the U-Haul for another two to three days.

51.     Over the next couple of weeks, Beth had little if any contact with John Garrison.

52.     On or around the evening of October 31, 2018, John Garrison showed up at Beth's home. In Beth's understanding, John Garrison's father had kicked him out, and he needed a place to sleep. Beth let him spend the night.

53.     The next day, Granite City police officers knocked on the door of Beth's house. The officers told Beth they wanted to speak with her about the U-Haul she had rented the previous month. They told her the U-Haul had been used in a crime.

54.     Beth had no idea what the officers were talking about, and she told them as much. She also explained that John Garrison and Timothy Woodrome had taken the U-Haul after she had finished using it. And she told the officers that John Garrison was presently in the home.

55.     The officers then took John Garrison to the police station for further questioning.

56.     On information and belief, John Garrison and Timothy Woodrome had driven the U-Haul truck to a Prairie Farms Dairy facility—located within the city limits of Granite City—in the early morning hours of October 16. On information and belief, John Garrison and Timothy Woodrome stole various steel appliances from the facility.

57.     On information and belief, both men were charged with felony theft based on this incident, and John Garrison later served 30 days in prison for his crime.

58.     Soon after learning of John Garrison's wrongdoing, Beth broke off all contact with him.

**C.      "If you feel bad, you should keep better company": Granite City makes Beth homeless**

59.     Granite City lost no time kicking its compulsory-eviction machine into high gear.

60.     Within days of John Garrison's arrest, Beth received a compulsory-eviction demand in the mail.

61.     The demand was sent from Lieutenant Mike Parkinson, Granite City's "Crime Free Multi-Housing Officer."

62.     The letter first stated in general terms that

> It is my understanding there is evidence of either the commission of a felony in your rental unit allowed or permitted by your lessee, or four Ordinance violations in your residential rental unit, or in common areas related to your rental unit, within the past six (6) months, or violation of any term of the lease addendum for crime free housing as detailed in Ordinance #8343.

63.     The letter also stated (with capitalizations altered):

> On October 19th, 2018 members of the Granite City Police Department investigated a theft of equipment from Prarie Farms, 1800 Adams St., in Granite City. This investigation lead to the arrest of John T. Garrison for felony theft. Garrison was arrested at 1712 Delmar and advised he lived at that address without having been placed on the occupancy permit. The theft was facilitated by the use of the rental truck that was rented by Beth A. McGrath also a tenant of 1712 Delmar Ave. On November 1st, 2018 John T. Garrison was formally charged with theft over $500.00 a class 3 felony, Madison County Warrant 2018CF003306.

64.     Beth requested a hearing at city hall.

65.     The City set a grievance hearing for December 17, 2018.

66.     After receiving the compulsory-eviction demand, Beth repeatedly tried to call Lieutenant Parkinson. She recalls speaking with him on the phone once. On that call, she begged him to let her stay in her home. Lieutenant Parkinson rebuffed her pleas with comments to the following effect: "Quit your crying," "I have no sympathy for you whatsoever," and "If you feel bad, you should keep better company." He also told her that filing an appeal "probably wouldn't help you" (or words to that effect).

67.     Undeterred, Beth attended the grievance hearing.

68.     Before her case was called, Beth approached Lieutenant Parkinson and again asked him to let her stay in her house. Lieutenant Parkinson responded with words to the following effect: "Like I told you, Ms. McGrath, I have no sympathy for you. We know he was living with you. Save it for the judge."

69.     Before the hearing officer, Beth stated that "when the police came, [Garrison's crime] was brand new to me." She stated that "I had no idea they were robbing anything." She also told the hearing officer: "I'm not looking for sympathy, but I have two disability -- two disabled kids in my home: one is my nephew, who's foster care, and one is my twenty-two-year-old son, who has schizophrenia and autism."

70.     Since John Garrison's arrest, Beth explained, "John has been to my door, he's banged on my door, and I'm scared to open the door for him to even have a conversation with him, because I'm scared that if I open the door for him and he gets caught there they're going to say that he lives with me."

71.     Through tears, Beth asked the hearing officer: "Am I going to stay in my house?"

72.     At the grievance hearing, the police officer representing Granite City focused almost exclusively on the City's claim that John Garrison resided or was a guest at Beth's home.

-13-

73.     At the grievance hearing, the police officer representing Granite City did not contend that Beth was a participant or co-conspirator in the crime committed by John Garrison.

74.     At the grievance hearing, the police officer representing Granite City presented no evidence suggesting that Beth was a participant or co-conspirator in the crime committed by John Garrison.

75.     A true and correct copy of the City's audio recording of the December 17, 2018 hearing accompanies this Complaint as Exhibit 1.

76.     In February 2019, the City issued the hearing officer's decision. In a section titled "FINDINGS OF FACT," the City's hearing officer wrote:

> A violation has occurred pursuant to Granite City Ordinance 8186-AN ORDINANCE TO AMENDORDINANCE 7948, TO REGULATE BUSINESS LICENSES FOR LESSORS OF RESIDENTIAL UNITS, AND TO CALL FOR REVOCATION OF LESSOR'S BUSINESS LICENSES, WHERE THE LESSOR PERMIT'S THE LEASED PREMISES TO HARBOR CRIMINAL ACTIVITY.

77.     The hearing officer's decision included no other "findings of fact."

78.     On information and belief, the City's hearing officer recited identically worded "findings of fact" in almost every grievance hearing held under Granite City Municipal Code § 5.142.080.

79.     The "findings of fact" issued in Beth's hearing even contained the same typographical errors as the "findings of fact" issued in other grievance hearings. Those same typographical errors appeared in "findings of fact" issued as early as January 2011.

80.     On information and belief, the City's hearing officer copied the "findings of fact" from a decision issued in a previous grievance hearing and pasted that text into a new document to create "findings of fact" for Beth. On information and belief, the City's hearing officer engaged in this boilerplate practice from as early as 2011 until November 2019.

81.     For his "DECISION," the City's hearing officer wrote: "The landlord, Scheffel Rentals, must begin eviction proceedings against the tenant, Beth McGrath."

82.     On information and belief, Beth's landlord did not want to evict Beth.

83.     On information and belief, but for Granite City's compulsory-eviction demand, Beth's landlord would not have chosen to end Beth's lease at 1712 Delmar Avenue based on John Garrison's crime.

84.     Given the City's demand that he "must begin eviction proceedings," however, Beth's landlord felt that he had no choice but to comply with the City's order.

85.     Beth's landlord owned other rental properties in the area, and he tried to find another one for Beth and Quinton to move into. But no property that might accommodate them was move-in ready.

86.     To avoid having to go through an eviction proceeding—which would have made finding a new home even harder—Beth left 1712 Delmar Avenue without having anywhere else to live.

**HARM TO BETH**

87.     The first night after leaving their home at 1712 Delmar Avenue, Beth and her son Quinton slept in their car.

88.     In the following three to four weeks, Beth tried desperately to find a new place for them to live. She estimates that she looked at dozens of rental properties.

89.     During this period, Beth and Quinton had no reliable place to stay. Most days, they would have to figure out where they were going to sleep and eat and clean themselves.

90.     Some nights, Beth and Quinton would have to stay on friends' couches.

91.     Other nights, Beth and Quinton would stay in a motel room.

92.     During this period, the Salvation Army paid for Beth and Quinton to spend ten days in a motel.

93.     During this period, Beth struggled to get food for herself and for Quinton.

94.     During this period, Beth struggled to find places for her and Quinton to stay.

95.     During this period, Beth struggled even to find places for her and Quinton to shower.

96.     Having lost her home, Beth had to give away many of her belongings, including a couch, a recliner chair, and dishes. Others she sold, including two televisions and Quinton's laptop and PlayStation. Because she desperately needed the money and had nowhere to store all her belongings, Beth sold her property for far less than it was worth.

97.     After around three weeks of homelessness, Beth finally moved into a new rental property, this one in Alton, Illinois.

98.     Granite City's compulsory-eviction law, the City's enforcement of its compulsory-eviction law, and the City's policies and practices associated with its compulsory-eviction law directly and proximately caused serious harms to Beth, including but not limited to:

        a.     **Losing her home.** As a direct and proximate result of Granite City's compulsory-eviction law, the City's enforcement of its compulsory-eviction law, and the City's policies and practices associated with its compulsory-eviction law, Beth was forced to surrender her leasehold interest in 1712 Delmar Avenue and move out of her home. Beyond the value of the leasehold, losing her home caused Beth substantial harm, both economic and noneconomic.

b.      **Losing time.** As a direct and proximate result of Granite City's compulsory-eviction law, the City's enforcement of its compulsory-eviction law, and the City's policies and practices associated with its compulsory-eviction law, Beth spent weeks trying to find a new place to live, trying to find interim shelter, and trying to find ways to ensure that she and her son could eat, sleep, and engage in basic hygiene.

c.      **Losing property.** As a direct and proximate result of Granite City's compulsory-eviction law, the City's enforcement of its compulsory-eviction law, and the City's policies and practices associated with its compulsory-eviction law, Beth suffered economic harm. She gave away belongings that she would have kept but for the City's compulsory-eviction law, the City's enforcement of its compulsory-eviction law, and the City's policies and practices associated with its compulsory-eviction law. She sold other property (much of it at a steep discount) that she would have kept but for the City's compulsory-eviction law, the City's enforcement of its compulsory-eviction law, and the City's policies and practices associated with its compulsory-eviction law.

d.      **Losing money.** As a direct and proximate result of Granite City's compulsory-eviction law, the City's enforcement of its compulsory-eviction law, and the City's policies and practices associated with its compulsory-eviction law, Beth also was forced to incur costs. She spent money on gas so that she could drive her car to look for a new home and to look for temporary shelter. She also spent money on motel rooms. She

would not have incurred these and other expenses but for the City's compulsory-eviction law, the City's enforcement of its compulsory-eviction law, and the City's policies and practices associated with its compulsory-eviction law.

## CONSTITUTIONAL VIOLATIONS

### <u>Count I</u>
**Fourteenth Amendment to the U.S. Constitution
(Due Process Clause)**

99.     Plaintiff adopts and realleges the allegations contained in paragraphs 1 through 98 of this Complaint.

100.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

101.     The Due Process Clause secures against state infringement of those fundamental rights and liberties that are deeply rooted in our Nation's history and traditions and that are implicit in the concept of ordered liberty.

102.     Among those rights is the right of innocent people not to be punished by the government.

103.     Stripping innocent people of their home based on the crime of another infringes their fundamental rights.

104.     Beth had a fundamental property right and a fundamental liberty interest in her lease with the owner of 1712 Delmar Avenue, in Granite City, Illinois.

105.     Beth had a fundamental property right and a fundamental liberty interest in her home at 1712 Delmar Avenue, in Granite City, Illinois.

106.    Granite City's compulsory-eviction law, its enforcement of the compulsory-eviction law, and its policies and practices associated with the compulsory-eviction law violated Beth's fundamental rights under the Due Process Clause.

107.    To the extent Beth's lease authorized her landlord to terminate the agreement in certain circumstances, her landlord retained the discretion (as with any contract) to enforce or not enforce his right to terminate the agreement.

108.    On information and belief, Beth's landlord did not want to terminate his lease with Beth based on the crime committed by John Garrison.

109.    On information and belief, but for Granite City's compulsory-eviction demand, Beth's landlord would not have chosen to end Beth's lease at 1712 Delmar Avenue based on John Garrison's crime.

110.    Effectively, the compulsory-eviction law required that Beth's interest in her home at 1712 Delmar Avenue be extinguished.

111.    Extinguishing Beth's interest in her home at 1712 Delmar Avenue served no purpose beyond punishing her (and her son) for a crime committed by John Garrison.

112.    In fact, the effect of extinguishing Beth's property right in her home at 1712 Delmar Avenue in these circumstances was to punish Beth far more harshly than John Garrison—even though Garrison is the one alleged to have committed the crime in question.

113.    Granite City did not contend at the grievance hearing that Beth was a participant or co-conspirator in the crime committed by John Garrison.

114.    Beth was not a participant or co-conspirator or in any other way involved in the crime committed by John Garrison.

115.     In fact, Beth did not even learn about John Garrison's crime until long after it took place.

116.     In being targeted by Granite City's compulsory-eviction law, Beth was not punished for anything she did. She was instead punished purely because Granite City believed that John Garrison spent some amount of time at her home. Holding individuals strictly liable for crimes committed by people they associate with infringes their fundamental rights.

117.     The City's efforts to strip Beth of her home for a crime committed by an ex-boyfriend shock the conscience.

118.     Just as Granite City could not constitutionally violate Beth's fundamental rights directly, the City could not constitutionally coerce her landlord to violate her fundamental rights on the City's behalf.

119.     Granite City's compulsory-eviction law, on its face and as applied to Beth, violated Beth's rights under the Due Process Clause of the Fourteenth Amendment and harmed her.

## Count II
## Fourteenth Amendment to the U.S. Constitution
## (Equal Protection Clause)

120.     Plaintiff adopts and realleges the allegations contained in paragraphs 1 through 98 of this Complaint.

121.     The Equal Protection Clause of the Fourteenth Amendment requires government officials to treat similarly situated individuals similarly.

122.     Granite City's compulsory-eviction law violated Beth's rights under the Equal Protection Clause in at least two ways.

123.    *First*, the compulsory-eviction law treated Beth differently from people who are identically situated in all respects but one: having a traditional mortgage or owning their home outright rather than possessing a leasehold interest.

124.    The City's compulsory-eviction law distinguished between (1) people who own their homes in fee simple or who have traditional mortgages, and (2) people who rent their homes or who are buying their homes under an installment contract.

125.    Under the City's compulsory-eviction law, people who owned their homes in fee simple or who had traditional mortgages were not punished for crimes committed by other people. Renters, by contrast, were punished for crimes committed by other people.

126.    The only reason the City enforced its compulsory-eviction law against Beth is that her property interest in her home at 1712 Delmar Avenue took the form of a leasehold. If she had held any other property interest in the home—fee simple, fee simple subject to a mortgage lien, a life estate, etc.—she would not have been subject to the compulsory-eviction law.

127.    If, at the time John Garrison had committed his offense, Beth had owned her home in fee simple, the City could not have enforced its compulsory-eviction law against her.

128.    If, at the time John Garrison had committed his offense, Beth had owned her home in fee simple subject to a traditional mortgage, the City could not have enforced its compulsory-eviction law against her.

129.    In all material respects, Beth was similarly situated to other Granite City residents who own their homes in fee simple.

130.    In all material respects, Beth was similarly situated to other Granite City residents who have a traditional mortgage.

131.   In distinguishing between residents who own their homes in fee simple (or subject to a traditional mortgage) and residents who rent their homes or are buying them under an installment contract, the City burdened the latter residents' fundamental rights.

132.   The City cannot justify under any level of scrutiny its distinction between residents who own their homes in fee simple (or subject to a traditional mortgage) and residents who rent their homes or are buying them under an installment contract.

133.   On information and belief, the City will be unable to produce any evidence sufficient to justify its distinction between residents who own their homes in fee simple (or subject to a traditional mortgage) and residents who rent their homes or are buying them under an installment contract.

134.   The City's distinction between residents who own their homes in fee simple (or subject to a traditional mortgage) and residents who rent their homes or are buying them under an installment contract fails every level of constitutional scrutiny. That is because the distinction is not rationally related to a legitimate governmental interest.

135.   There was no legitimate reason for Granite City's compulsory-eviction law to treat Beth worse than residents who own their homes or who have a mortgage.

136.   *Second*, Granite City's compulsory-eviction law treated Beth differently from other people who have the same amount of alleged responsibility—i.e., none—for the crime underlying the City's compulsory-eviction demand.

137.   Under the compulsory-eviction law, Beth could not legally continue to live in her home at 1712 Delmar Avenue because John Garrison committed a crime somewhere else.

138.   Beth was not involved in the crime committed by John Garrison.

139.   Beth had no responsibility for the crime committed by John Garrison.

140.    In fact, Beth did not know the crime had been committed until long after the fact.

141.    With respect to the crime that is the basis for Granite City's compulsory-eviction demand, Beth was similarly situated to everyone else in the world (except for John Garrison and Timothy Woodrome) in that she had no responsibility for the crime committed by John Garrison and Timothy Woodrome.

142.    Yet Granite City's compulsory-eviction law singled Beth out for unique—and uniquely harsh—treatment.

143.    Having removed Beth from 1712 Delmar Avenue, Beth's landlord was free to rent 1712 Delmar Avenue to literally anyone else in the world—including John Garrison, whose alleged crime was the sole basis for the City's compulsory-eviction demand.

144.    Beth was treated worse than everyone else in the world, including John Garrison: Under the City's compulsory-eviction law, Beth alone was prohibited from living in her home at 1712 Delmar Avenue.

145.    There was no good reason for Beth—alone in the world—to be forbidden from maintaining a home at 1712 Delmar Avenue.

146.    Immediately upon her leaving 1712 Delmar Avenue, any other landlord at any other property in Granite City was free to rent any other home to Beth.

147.    Indeed, Beth was eligible to rent a different home from the same landlord. If, for example, her landlord also owned *1718* Delmar Avenue, he could have complied with the terms of the compulsory-eviction law simply by moving Beth next door—even if John Garrison were to have joined her.

148.    Requiring Beth to move but not to otherwise change anything about her household served no legitimate end of government. There was no legitimate reason for Granite

City to prevent Beth from leasing 1712 Delmar Avenue while leaving her free to lease any other property within city limits.

149.    In distinguishing between Beth and everyone else in the world, Granite City's compulsory-eviction law burdened Beth's fundamental rights.

150.    The City cannot justify under any level of scrutiny its distinction between Beth and everyone else in the world.

151.    On information and belief, the City will be unable to produce any evidence sufficient to justify its distinction between Beth and everyone else in the world.

152.    The City's distinction between Beth and everyone else in the world fails every level of constitutional scrutiny. That is because the distinction is not rationally related to a legitimate governmental interest.

153.    There was no legitimate reason for Granite City's compulsory-eviction law to treat Beth worse than everyone else in the world.

154.    For each of the grounds described above, Granite City's compulsory-eviction law, on its face and as applied, violated Beth's rights under the Equal Protection Clause of the Fourteenth Amendment and harmed her.

**Count III**
**First and Fourteenth Amendments to the U.S. Constitution**
**(Freedom of Association)**

155.    Plaintiff adopts and realleges the allegations contained in paragraphs 1 through 98 of this Complaint.

156.    The U.S. Constitution (including the First and Fourteenth Amendments) protects the right of association.

157.    The only reason that Granite City forced Beth out of her home is that Granite City believed that John Garrison lived at or spent some amount of time at her home.

158.    Letting a friend and former romantic partner spend time in one's home is a form of association.

159.    Punishing Beth for crimes committed by John Garrison amounted to punishing her for her decision to associate with John Garrison.

160.    At all relevant times, Granite City's compulsory-eviction law contained none of the procedural protections or substantive requirements found in any of the other legal tools, like the law of conspiracy, by which one person may be held responsible for the crimes of another.

161.    Instead, the compulsory-eviction law imposed guilt by association for the crimes of anyone who ever spent time in a lessee's home, whether brother, lover, or friend.

162.    Holding individuals strictly liable for crimes committed by people they associate with burdens the right to association.

163.    Upon information and belief, Granite City had no good reason—and possesses no evidence suggesting it had a good reason—for holding lessees strictly liable for the crimes of their household members and guests.

164.    Granite City's compulsory-eviction law, on its face and as applied to Beth, unconstitutionally violated Beth's right to association and harmed her.

## Count IV
## Fifth and Fourteenth Amendments to the U.S. Constitution
## (Takings Clause)

165.    Plaintiff adopts and realleges the allegations contained in paragraphs 1 through 98 of this Complaint.

166.    If this Court denies Plaintiff relief under Counts I through III of this Complaint, Plaintiff asks that the Court enter judgment in her favor on this Count IV.

167.    A leasehold is a property interest protected under Illinois law.

168.    Beth's leasehold in 1712 Delmar Avenue, in Granite City, was a property interest protected under Illinois law.

169.    By coercing Beth to leave 1712 Delmar Avenue against her will, Granite City deprived her of her entire property interest in 1712 Delmar Avenue.

170.    Because Beth would not have had to leave 1712 Delmar Avenue but for Granite City's enforcement of its compulsory-eviction law, Granite City's enforcement of the compulsory-eviction law was the sole cause of the destruction of her property interest in 1712 Delmar Avenue.

171.    On its face and as applied, Granite City's compulsory-eviction law deprived Beth of a reasonable market return on her interest in 1712 Delmar Avenue. Granite City, acting under color of law, caused Beth to be deprived of her property interest in 1712 Delmar Avenue without just compensation in violation of the Takings Clause of the Constitution.

## PRAYER FOR RELIEF

Plaintiff requests that the Court:

A.    Declare that the City of Granite City's compulsory-eviction law—both on its face
      and as applied to Plaintiff—violated the Fourteenth Amendment's Due Process
      Clause, the Fourteenth Amendment's Equal Protection Clause, and the
      constitutional right to association;

B.    If the Court does not grant Plaintiff relief under Counts I through III of this
      Complaint, declare that the City of Granite City's enforcement of its compulsory-
      eviction law—both on its face and as applied to Plaintiff—was a taking under the
      Fifth Amendment's Takings Clause (as incorporated against the States) entitling
      Plaintiff to just compensation;

C.    Award Plaintiff money damages against the City of Granite City;

D.    If the Court does not grant Plaintiff relief under Counts I through III of this
      Complaint, award Plaintiff just compensation under the Fifth Amendment (as
      incorporated against the States);

E.    Award attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C.
      § 1988 and all other applicable federal laws;

F.    Award such further legal and equitable relief as the Court may deem just and
      proper.

Dated: November 4, 2020.

Bart C. Sullivan, #6198093
FOXSMITH, LLC
One South Memorial Drive, 12th Floor
St. Louis, MO 63102
Telephone: 314.588.7000
Facsimile: 314.588.1965
E-mail: bsullivan@foxsmith.com

Respectfully submitted,

s/Samuel B. Gedge
Samuel B. Gedge (lead attorney)
Robert McNamara
Caroline Grace Brothers
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Telephone: 703.682.9320
Facsimile: 703.682.9321
E-mail: sgedge@ij.org; rmcnamara@ij.org;
cgbrothers@ij.org